# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 39218

EDWARD JOHN STEVENS,

        Petitioner-Appellant,

v.

STATE OF IDAHO,

        Respondent.

2013 Opinion No. 64

Filed: December 10, 2013

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Darla S. Williamson, District Judge.

Judgment denying petition for post-conviction relief, affirmed.

Dennis Benjamin of Nevin, Benjamin, McKay & Bartlett LLP, Boise, for appellant. Dennis Benjamin argued.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

---

GUTIERREZ, Chief Judge

Edward John Stevens appeals from the district court's judgment denying his petition for post-conviction relief. Specifically, he contends the district court erred by summarily dismissing his claim that his appellate counsel was ineffective for failing to appeal the appointment of a Supreme Court justice to hear his new trial motion. He also contends the district court erred by denying his claims, following an evidentiary hearing, that the prosecution committed a *Brady*[1] violation by failing to disclose evidence that the deceased child's eyes were removed after embalming and that defense counsel were ineffective for failing to discover and present evidence regarding when the child's eyes were removed, the possible side effects of medication the child was taking, and the length and the timing of the skull fracture suffered by the child. Finally, he

---

[1] *See Brady v. Maryland*, 373 U.S. 83 (1963).

1

contends the alleged instances of deficient performance of defense counsel amounted to cumulative error. For the reasons set forth below, we affirm.

## I.

## FACTS AND PROCEDURE

On the afternoon of December 27, 1996, an eleven-month-old boy (child) sustained a serious head injury while in the care of Stevens, the child's mother's boyfriend. The child died the next day after he was declared brain dead and removed from life support. Stevens claimed the head injury was the result of an accidental fall down the stairs, but the State contended the head injury occurred after Stevens violently shook the child and slammed the child's head onto the edge of a bathtub. Stevens was charged with murder in the first degree for killing the child during the course of committing an aggravated battery, Idaho Code §§ 18-4001, 18-4002, 18-4003(d).

At trial,[2] both the State and the defense agreed the child died as a result of his head injury. However, Stevens argued the cause of the injury was accidental, asserting he fell asleep and awoke approximately twenty minutes later to the sound of "thumps or a thud" and discovered the child lying at the bottom of the stairs not moving. After attempting to rouse the child and administer cardiopulmonary resuscitation (CPR), Stevens called 911 approximately five minutes later.

The State contended Stevens had been physically abusing the child since July, and on December 27, he was in the bathroom with the child, got frustrated with the child, violently shook the child, and then slammed the child's head against the side of the bathtub. The State further contended that Stevens then waited over half an hour to call 911. The State relied on essentially four components to prove this theory: (1) evidence that Stevens gave inconsistent accounts of what happened on December 27; (2) evidence that the child had been abused over the prior six months; (3) evidence that a child could not receive as severe a skull fracture as suffered by the child from a fall down stairs; and (4) evidence that the child had been shaken on December 27. In regard to the issue of how the child sustained the head injury, the State presented the testimony of five experts who testified the child could not have received the type of

---

[2]     Stevens' first trial ended in mistrial after the jury could not reach a unanimous verdict. The second trial is at issue in this appeal.

fracture he sustained from a fall down the stairs, while Stevens called three experts who testified the child could have. To support the State's assertion that the child had been shaken, a critical allegation that formed the aggravated battery portion of the first degree murder charge, the State presented various experts who testified to the brain and eye injuries sustained by the child and their opinions, to varying degrees, as to whether these injuries were caused by shaking. One expert in particular, Dr. Brooks Crawford, who examined the child's eyes after they were removed from his body, testified the constellation of injuries he found were highly specific to shaken baby syndrome. Stevens countered by offering the expert testimony of two doctors who stated that several of the injuries were consistent with a fall down the stairs and "science still does not fully understand the significance of these eye findings." The jury found Stevens guilty as charged.

Stevens appealed his conviction to the Idaho Supreme Court, but prior to oral argument, he moved for a new trial based on newly discovered evidence. His appeal was suspended pending the district court's decision on that motion. Stevens alleged he was entitled to a new trial based on newly discovered evidence consisting of, among other things, evidence that the child's eyes may have been damaged during embalming, including affidavits by experts contending the damage occurred after death and a mortuary report indicating the child was embalmed prior to his eyes being removed for examination, and information that Propulsid, a reflux drug being taken by the child, had been linked to instances of cardiac arrest (which Stevens claimed offered a possible alternate cause of death and/or reason the child would have fallen down the stairs). The Idaho Supreme Court appointed Justice Daniel Eismann, who had presided over the trial and sentencing as a district court judge before being elected to the Supreme Court, to hear the new trial motion. Stevens objected to the appointment, filing motions in both the Supreme Court and district court, but they were denied. Following a hearing, Justice Eismann denied the new trial motion, finding that the evidence indicating the eye damage occurred after death, including the mortuary report and the evidence relied upon by the experts in their affidavits, was not newly discovered evidence because counsel could have discovered it with due diligence and that evidence about the possible side effects of Propulsid would probably not have produced an acquittal. The Supreme Court affirmed the denial of the new trial motion on appeal. *State v. Stevens*, 146 Idaho 139, 144, 191 P.3d 217, 222 (2008).

3

In 2009, Stevens filed a petition for post-conviction relief claiming, in relevant part, that his appellate counsel was ineffective for failing to appeal the denial of his challenge to the appointment of Justice Eismann; that he was denied due process because the State failed to turn over exculpatory evidence indicating the eyes were removed post-embalming, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and that his appointed defense counsel[3] were ineffective for failing to discover and/or present exculpatory evidence, specifically the mortuary report, that the child was embalmed before his eyes were removed for examination and failing to discover and/or present evidence regarding the possible side effects of Propulsid and the length and timing of the child's skull fracture. Stevens also alleged the cumulative effect of defense counsel's deficient performance resulted in prejudice and denied him the effective assistance of counsel. The district court summarily dismissed the ineffective assistance of appellate counsel claim and denied the remaining claims following an extensive evidentiary hearing. Stevens now appeals the denial of his petition for post-conviction relief.

## II.

## ANALYSIS

A petition for post-conviction relief initiates a civil, rather than criminal, proceeding, governed by the Idaho Rules of Civil Procedure. *State v. Yakovac*, 145 Idaho 437, 443, 180 P.3d 476, 482 (2008). *See also Pizzuto v. State*, 146 Idaho 720, 724, 202 P.3d 642, 646 (2008). Like plaintiffs in other civil actions, the petitioner must prove by a preponderance of evidence the allegations upon which the request for post-conviction relief is based. *Stuart v. State*, 118 Idaho 865, 869, 801 P.2d 1216, 1220 (1990); *Goodwin v. State*, 138 Idaho 269, 271, 61 P.3d 626, 628 (Ct. App. 2002). A petition for post-conviction relief differs from a complaint in an ordinary civil action, however, in that it must contain more than "a short and plain statement of the claim" that would suffice for a complaint under Idaho Rule of Civil Procedure 8(a)(1). *State v. Payne*, 146 Idaho 548, 560, 199 P.3d 123, 135 (2008); *Goodwin*, 138 Idaho at 271, 61 P.3d at 628. The petition must be verified with respect to facts within the personal knowledge of the petitioner, and affidavits, records or other evidence supporting its allegations must be attached, or the

---

[3] Stevens was appointed two trial attorneys. Hereinafter, when referring to the attorneys individually, we use the terms "Lead Counsel" and "Second Chair." When referring to them collectively, we continue to use "defense counsel" or "counsel."

4

petition must state why such supporting evidence is not included. I.C. § 19-4903. In other words, the petition must present or be accompanied by admissible evidence supporting its allegations or it will be subject to dismissal. *Wolf v. State*, 152 Idaho 64, 67, 266 P.3d 1169, 1172 (Ct. App. 2011); *Roman v. State*, 125 Idaho 644, 647, 873 P.2d 898, 901 (Ct. App. 1994).

Idaho Code § 19-4906 authorizes summary dismissal of a petition for post-conviction relief, either pursuant to motion of a party or upon the court's own initiative, if "it appears from the pleadings, depositions, answers to interrogatories, and admissions and agreements of facts, together with any affidavits submitted, that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." I.C. § 19-4906(c). When considering summary dismissal, the district court must construe disputed facts in the petitioner's favor, but the court is not required to accept either the petitioner's mere conclusory allegations, unsupported by admissible evidence, or the petitioner's conclusions of law. *Payne*, 146 Idaho at 561, 199 P.3d at 136; *Roman*, 125 Idaho at 647, 873 P.2d at 901. Moreover, because the district court rather than a jury will be the trier of fact in the event of an evidentiary hearing, the district court is not constrained to draw inferences in the petitioner's favor, but is free to arrive at the most probable inferences to be drawn from the evidence. *Yakovac*, 145 Idaho at 444, 180 P.3d at 483; *Wolf*, 152 Idaho at 67, 266 P.3d at 1172; *Hayes v. State*, 146 Idaho 353, 355, 195 P.3d 712, 714 (Ct. App. 2008). Such inferences will not be disturbed on appeal if the uncontroverted evidence is sufficient to justify them. *Chavez v. Barrus*, 146 Idaho 212, 218, 192 P.3d 1036, 1042 (2008); *Hayes*, 146 Idaho at 355, 195 P.2d at 714; *Farnsworth v. Dairymen's Creamery Ass'n*, 125 Idaho 866, 868, 876 P.2d 148, 150 (Ct. App. 1994).

Claims may be summarily dismissed if the petitioner's allegations are clearly disproven by the record of the criminal proceedings, if the petitioner has not presented evidence making a prima facie case as to each essential element of the claims, or if the petitioner's allegations do not justify relief as a matter of law. *Kelly v. State*, 149 Idaho 517, 521, 236 P.3d 1277, 1281 (2010); *McKay v. State*, 148 Idaho 567, 570, 225 P.3d 700, 703 (2010); *DeRushé v. State*, 146 Idaho 599, 603, 200 P.3d 1148, 1152 (2009); *Charboneau v. State*, 144 Idaho 900, 903, 174 P.3d 870, 873 (2007); *Berg v. State*, 131 Idaho 517, 518, 960 P.2d 738, 739 (1998); *Murphy v. State*, 143 Idaho 139, 145, 139 P.3d 741, 747 (Ct. App. 2006); *Cootz v. State*, 129 Idaho 360, 368, 924 P.2d 622, 630 (Ct. App. 1996). Thus, summary dismissal of a claim for post-conviction relief is appropriate when the court can conclude, as a matter of law, the petitioner is not entitled to relief

5

even with all disputed facts construed in the petitioner's favor. For this reason, summary dismissal of a post-conviction petition may be appropriate even when the State does not controvert the petitioner's evidence. *See Payne*, 146 Idaho at 561, 199 P.3d at 136; *Roman*, 125 Idaho at 647, 873 P.2d at 901.

On appeal from an order of summary dismissal, we apply the same standards utilized by the trial courts and examine whether the petitioner's admissible evidence asserts facts that, if true, would entitle the petitioner to relief. *Ridgley v. State*, 148 Idaho 671, 675, 227 P.3d 925, 929 (2010); *Berg*, 131 Idaho at 519, 960 P.2d at 740; *Sheahan v. State*, 146 Idaho 101, 104, 190 P.3d 920, 923 (Ct. App. 2008); *Roman*, 125 Idaho at 647, 873 P.2d at 901. Over questions of law, we exercise free review. *Rhoades v. State*, 148 Idaho 247, 250, 220 P.3d 1066, 1069 (2009); *Downing v. State*, 136 Idaho 367, 370, 33 P.3d 841, 844 (Ct. App. 2001); *Martinez v. State*, 130 Idaho 530, 532, 944 P.2d 127, 129 (Ct. App. 1997).

Conversely, if the petition, affidavits and other evidence supporting the petition allege facts that, if true, would entitle the petitioner to relief, the post-conviction claim may not be summarily dismissed. *Charboneau v. State*, 140 Idaho 789, 792, 102 P.3d 1108, 1111 (2004); *Berg*, 131 Idaho at 519, 960 P.2d at 740; *Stuart*, 118 Idaho at 934, 801 P.2d at 1285; *Sheahan*, 146 Idaho at 104, 190 P.3d at 923; *Roman*, 125 Idaho at 647, 873 P.2d at 901. If a genuine issue of material fact is presented, an evidentiary hearing must be conducted to resolve the factual issues. *Kelly*, 149 Idaho at 521, 236 P.3d at 1281; *Payne*, 146 Idaho at 561, 199 P.3d at 136; *Goodwin*, 138 Idaho at 272, 61 P.3d at 629. As stated above, in order to prevail in a post-conviction proceeding, the petitioner must prove the allegations by a preponderance of the evidence. *Stuart*, 118 Idaho at 869, 801 P.2d at 1220; *Baxter v. State*, 149 Idaho 859, 861, 243 P.3d 675, 677 (Ct. App. 2010). When reviewing a decision denying post-conviction relief after an evidentiary hearing, an appellate court will not disturb the lower court's factual findings unless they are clearly erroneous. I.R.C.P. 52(a); *Dunlap v. State*, 141 Idaho 50, 56, 106 P.3d 376, 382 (2004); *Russell v. State*, 118 Idaho 65, 67, 794 P.2d 654, 656 (Ct. App. 1990). The credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence are all matters solely within the province of the district court. *Dunlap*, 141 Idaho at 56, 106 P.3d at 382; *Larkin v. State*, 115 Idaho 72, 73, 764 P.2d 439, 440 (Ct. App. 1988). We exercise free review of the district court's application of the relevant law to the facts. *Baxter*, 149 Idaho at 862, 243 P.3d at 678.

6

**A.** *Brady* **Violation**

Stevens contends his Fourteenth Amendment right to due process was violated by the State's failure to disclose exculpatory evidence prior to trial as required by *Brady*, 373 U.S. 83. Specifically, he contends the State committed a *Brady* violation by failing to disclose that the child's eyes were removed post-embalming, a fact he argues indicates the child had not been shaken because it was the embalming process that likely caused the damage to the eyes that the State's experts at trial had testified were indicative of shaken baby syndrome. He contends at least one of the prosecutors knew this information, or even if the prosecutor did not know, members of the investigative team knew.

Due process requires all material exculpatory evidence known to the State or in its possession be disclosed to the defendant. *Id*. at 87; *Dunlap*, 141 Idaho at 64, 106 P.3d at 390. *See also* I.C.R. 16(a). There are three essential components of a true *Brady* violation. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Dunlap*, 141 Idaho at 64, 106 P.3d at 390. First, the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching. *Dunlap*, 141 Idaho at 64, 106 P.3d at 390; *Queen v. State*, 146 Idaho 502, 504, 198 P.3d 731, 733 (Ct. App. 2008). Evidence is exculpatory if it "tends to clear an accused of alleged guilt, excuses the actions of the accused, or tends to reduce punishment." *State v. Gardner*, 126 Idaho 428, 433, 885 P.2d 1144, 1149 (Ct. App. 1994) (quoting *State v. Johnson*, 120 Idaho 408, 411, 816 P.2d 364, 367 (Ct. App. 1991)). Next, the evidence must have been suppressed by the state, either willfully or inadvertently. *Dunlap*, 141 Idaho at 64, 106 P.3d at 390; *Queen*, 146 Idaho at 504, 198 P.3d at 733. Finally, prejudice must have ensued. *Dunlap*, 141 Idaho at 64, 106 P.3d at 390; *Queen*, 146 Idaho at 504, 198 P.3d at 733. Prejudice occurs if there is a reasonable probability that, had the withheld evidence been disclosed to the defense, the result of the proceeding would have been different. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). A "reasonable probability" of a different result is shown when the government's suppression of evidence undermines confidence in the outcome of the trial. *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Gardner*, 126 Idaho at 436, 885 P.2d at 1152.

The duty of disclosure enunciated in *Brady* is an obligation of not just the individual prosecutor assigned to the case, but of all the government agents having a significant role in investigating and prosecuting the offense. *State v. Avelar*, 132 Idaho 775, 781, 979 P.2d 648, 654 (1999); *Queen*, 146 Idaho at 504, 198 P.3d at 733. However, a prosecutor is not required to

7

disclose evidence the prosecutor does not possess or evidence of which the prosecutor could not reasonably be deemed to have imputed knowledge or control. *Avelar*, 132 Idaho at 781, 979 P.2d at 654; *Queen*, 146 Idaho at 504, 198 P.3d at 733.

As noted above, testimony regarding the condition of the child's eyes was significant at trial because it formed the basis of the State's theory that Stevens battered the child prior to striking the final blow that caused a skull fracture and eventual death. At trial, Dr. Gregory Kent, an ophthalmologist who took photographs of the child's eyes while the child was still in the hospital, testified he did not observe any macular or retinal folding in those photographs. Nor did he visualize any damage to the maculae when examining the eyes while the child was still alive. However, Dr. Crawford, an ophthalmologist specializing in eye pathology who examined the child's eyes after their removal, testified at trial that he observed such folds and other injuries that combined to indicate shaken baby syndrome. As set forth by Justice Eismann in his order denying Stevens' motion for a new trial, Dr. Crawford testified to the following significant findings at trial:

> (a) The existence of a perimacular fold. He testified that it was very highly specific of shaken baby syndrome because it takes a rotational force (like a whiplash injury), not a translational force, to cause a perimacular fold. He testified that a perimacular fold was not pathognomonic (a medical certainty) of shaken baby syndrome.
> (b) The existence of hemorrhages involving more than 20-30% of the retina. He testified that hemorrhages involving more than 20-30% of the retina is highly suggestive of shaken baby syndrome and that both of [the child's] eyes had hemorrhages involving more than 30% of the retina.
> (c) A lack of hemorrhages in the equatorial area of the eyes. He testified that there was a wide distribution of hemorrhages in [the child's] eyes, but a paucity of hemorrhages in the equatorial area. He testified he has never seen this distribution of hemorrhages other than in shaken baby syndrome.
> (d) A hemorrhage in the dura next to the attachment of the optic nerve to the eye. He testified that such condition was extremely significant because it is something you see in most cases of shaken baby syndrome and [is] rarely seen in any other condition.
> (e) The existence of bilateral retinal hemorrhages. He testified that many, if not most, cases of shaken baby syndrome will show retinal hemorrhages in both eyes, whereas with trauma there is usually just one eye involved.

Dr. Crawford concluded, "I can think of no other way to explain the findings, this constellation of findings that we have here, except for violent shaking. There's no other way to explain it." Additional expert witnesses for the State at trial agreed that the combination of macular folding,

perineural hemorrhages, and the severity, frequency, and locations of retinal hemorrhages in the child's eyes were indicative of shaken baby syndrome.

However, years after the trial, an investigator for the Ada County Public Defender's office contacted a prosecutor in the case, raising the issue of whether the child's eyes were removed after he was embalmed. The prosecutor requested that Detective Jim Miller, who also investigated the initial incident, look into the issue. Upon being asked by Det. Miller, no person involved at the time, including Dr. Ronald Slaughter who performed the autopsy, could remember exactly when the child's eyes were removed. The most significant information Det. Miller found came in the form of a mortuary embalming report, prepared by the embalmer Douglas Reinke, where Reinke indicated under "Description of Subject" that the child's eyes were brown. When Reinke was questioned at the evidentiary hearing on Steven's post-conviction petition as to whether he knew if the eyes were present at the time of embalming, Reinke testified, "Based on seeing them as being brown I would believe so."[4] This evidence, Stevens contends, is material and exculpatory because it tends to indicate some of the damage to the child's eyes, as described by Dr. Crawford, was caused after the child's death by the embalming process.

In support of this contention, Stevens submitted affidavits of several doctors. Dr. Cyril Wecht stated in a 2004 affidavit that embalming fluid shrinks and hardens tissue; the shrinkage of the retinal layers from the maculae would appear as perimacular folds; removal of the eyes after embalming would damage them because of the hardening; the slides of the child's eyes he reviewed do not show a vital reaction within the retina and maculae folds; and in his opinion, the post-embalming removal of the eyes caused the damage to and around the macular and retinal folds, or at least, cannot be ruled out as a cause. Dr. Patrick Lantz averred that, in his opinion, the lack of bleeding in the retinal folds and the significant retinal detachment indicate that most,

---

[4] The following exchange occurred between the prosecutor and Reinke on cross-examination at the evidentiary hearing:

[Prosecutor]: It's possible that you did not see [the child's] eyes when you wrote down brown, isn't it?
[Reinke]: I don't know why I would have written brown.
[Prosecutor]: Right. But I'm asking, is it possible that you just made a mistake?
[Reinke]: I just can't see that.

9

if not all, of the folds/retinal detachments in both eyes appear to have developed after death. Stevens also presented the affidavit of Dr. Steven Kane who opined that had the perimacular fold been present, Dr. Kent would have seen it.

In response, the State submitted an affidavit from Dr. Crawford, dated November 2005, again summarized by Justice Eismann:

> He stated that as an eye pathologist and the director of the eye pathology laboratory at the University of California, San Francisco, he has been doing careful and complete gross and microscopic examinations of on average two eyes a week for 38 years. He stated that upon his examination of [the child's] eyes, they were removed properly and not damaged during retrieval. He also stated that during his examination of [the child's eyes], he observed both horizontal macular folds and a perimacular fold circling around the macula. The horizontal macular folds are artifacts,[5] but he has never seen a perimacular fold that is an artifact. Dr. Crawford also stated that Drs. Wecht and Lantz may not have viewed representative slides or may lack training and expertise in the specialized field of eye pathology. He offered to send additional slides to them which show the hemorrhages they did not see, but the Defendant declined that offer. He also attached to his affidavit additional photographs of the hemorrhages, with hemorrhages and red blood cells circled or marked.

Stevens submitted another affidavit from Dr. Wecht, which, in part, responded to Dr. Crawford's affidavit:

> 10. The opinions expressed by Dr. Crawford in his trial testimony regarding the presence of a perimacular fold are contradicted by his own affidavit and by the photographic presentations available in this case. Dr. Crawford's retrospective explanation regarding his failure to have taken any photographs of [the child's] eyes and his attempts to explain his failure to have made appropriate notes and undertaken necessary investigative studies, as well as his attempted explanations to rationalize the significant inconsistency between his trial testimony and affidavit, render all of his opinions and conclusions regarding the presence of a perimacular fold as a basis for his conclusion that this child died as a result of deliberately inflicted head trauma meaningless and scientifically baseless.

As to who had knowledge that the eyes were allegedly removed after embalming, Stevens contends at least one prosecutor knew, and besides the prosecutor, he contends the following

---

5    The New Oxford American Dictionary defines, in relevant part, "artifact" as "something observed in a scientific investigation or experiment that is not naturally present but occurs as a result of the preparative or investigative procedure." THE NEW OXFORD AMERICAN DICTIONARY 89 (2001).

10

parties knew: Dr. Slaughter, who performed the autopsy; Edwin Sonnenberg, the Ada County Coroner who directed the autopsy; David Sherner, a deputy Ada County coroner, who was present at the autopsy and took photographs; and Detectives Jim Miller and Joe Miller[6] and Sergeant Gene Trakel, who were also present at the autopsy.

The district court denied this claim after an evidentiary hearing, finding, in relevant part, that Stevens "failed to prove by a preponderance of the evidence the eyes were removed post-embalming." We need not address the district court's factual finding because an examination of the record indicates that this is not an instance where the prosecutor violated her responsibilities under *Brady*. Here, it is clear the mortuary report was not in the prosecutors' (or their agents') possession or control and could not be reasonably imputed to them.[7] Rather, the funeral home (which was clearly not a State agent) had sole possession of the report until well after the trial in 2003 when, responding to an inquiry from the investigator for the public defender's office, the prosecutor requested the funeral home's files and forwarded them to the investigator and defense counsel.

In addition, even assuming the prosecutor or other members of the investigative team knew of the existence of the report and/or of the fact that the eyes were removed post-embalming, the evidence is, on its face, devoid of indications that it was exculpatory. On the record we have before us, there is little to no basis upon which to conclude the prosecutor or other members of the investigative team would or should have had any reason to believe this fact constituted material exculpatory evidence, such that the evidence must be disclosed. The record indicates it was not until Stevens obtained the opinion of several experts during the post-conviction proceedings that any inkling arose indicating the evidence was potentially exculpatory. This is distinguishable from evidence that a prosecutor and/or the investigative team can be reasonably expected to discern as exculpatory--such as a witness's statement identifying an alternate perpetrator than the defendant. Additional analysis, beyond the ken of

---

[6]   Detective Jim Miller noted in his report on the issue that Detective Joe Miller told him he "remembers [the child's] eyes being collected after the autopsy. He thought there had been at least one trip made to [the funeral home] by the coroner's office to collect [the child's] eyes and the tissue samples."

[7]   We also agree with the district court's finding that Stevens' assertion that the prosecutor actually knew the eyes had been removed following embalming, is based on "pure speculation."

the prosecutor and investigation team, was necessary in this case to reveal the exculpatory nature of the evidence in question. Under these circumstances, knowledge of the evidentiary significance of the embalming report and/or the timing of the removal of the child's eyes cannot reasonably be imputed to the prosecutor.

The Appellate Court of Illinois addressed a similar issue in *People v. Kirkpatrick*, 650 N.E.2d 267 (Ill. App. Ct. 1995). There, the defendant was convicted of assault with a knife during a fight. At trial, the defendant asserted for the first time that a hammer had been used as a weapon against him by the victim. In closing argument, the prosecutor argued that a hammer was never found. On appeal, the defendant argued the prosecutor committed a *Brady* violation by failing to disclose the existence of the hammer, which had been given to the sheriff's office by the defendant's girlfriend. There was no evidence in the record, however, that the girlfriend gave any explanation behind the hammer, and the court noted that neither the prosecutor nor any law enforcement officer may have been aware of the significance of the hammer, given that the defendant first raised the issue at trial. The court, therefore, surmised:

> [T]he *Brady* rule, which prevents the State from suppressing exculpatory evidence, does not apply unless the prosecutor possessed some knowledge of the exculpatory material's existence or exculpatory nature. Where an item is not obviously exculpatory, *Brady* imposes no obligation upon the State to disclose the item absent some indication or knowledge of the item's exculpatory nature in the context of the particular case. Because the record before us fails to show any awareness of any State agent of the claimed significance of the hammer--an item which is not obviously of an exculpatory nature--we hold that the State did not violate *Brady* by failing to disclose that it had the hammer in its possession.

*Kirkpatrick*, 650 N.E.2d at 270-71.

We agree with the reasoning of the *Kirkpatrick* Court. To hold that the prosecutor is required pursuant to *Brady* to disclose evidence it did not have in its possession, and for which there was no indication of exculpatory value, but which later turns out to be exculpatory, imposes an impossible burden that extends the rule beyond its constitutional basis of ensuring a fair trial. The district court did not err in denying Stevens' claim that his constitutional rights pursuant to *Brady* were infringed.

## B. Ineffective Assistance of Counsel

Stevens contends both his defense counsel and appellate counsel rendered ineffective assistance. A claim of ineffective assistance of counsel may properly be brought under the Uniform Post-Conviction Procedure Act. *Barcella v. State*, 148 Idaho 469, 477, 224 P.3d 536,

12

544 (Ct. App. 2009). To prevail on an ineffective assistance of counsel claim, the petitioner must show that the attorney's performance was deficient and the petitioner was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Self v. State*, 145 Idaho 578, 580, 181 P.3d 504, 506 (Ct. App. 2007). To establish a deficiency, the petitioner has the burden of showing the attorney's representation fell below an objective standard of reasonableness. *Aragon v. State*, 114 Idaho 758, 760, 760 P.2d 1174, 1176 (1988); *Knutsen v. State*, 144 Idaho 433, 442, 163 P.3d 222, 231 (Ct. App. 2007). To establish prejudice, the petitioner must show a reasonable probability that, but for the attorney's deficient performance, the outcome of the proceeding would have been different. *Aragon*, 114 Idaho at 761, 760 P.2d at 1177; *Knutsen*, 144 Idaho at 442, 163 P.3d at 231. This Court has long adhered to the proposition that tactical or strategic decisions of counsel will not be second-guessed on appeal unless those decisions are based on inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. *Gonzales v. State*, 151 Idaho 168, 172, 254 P.3d 69, 73 (Ct. App. 2011). There is a strong presumption that counsel's performance fell within the wide range of professional assistance. *State v. Shackelford*, 150 Idaho 355, 383, 247 P.3d 582, 610 (2010); *State v. Hairston*, 133 Idaho 496, 511, 988 P.2d 1170, 1185 (1999).

Because it proves important in this case, we note that in *Strickland*, the United States Supreme Court elaborated regarding the considerations applicable when a court is determining whether counsel rendered deficient performance:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.
>
> The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant

13

would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

*Strickland*, 466 U.S. at 689-90 (citations omitted).

### 1.    Appellate counsel

Stevens contends the district court erred by summarily dismissing his claim that appellate counsel was ineffective for failing to appeal the denial of his motion to disqualify Justice Eismann from adjudicating Stevens' motion for a new trial after Justice Eismann was appointed to the Idaho Supreme Court. The claim that Stevens was denied the effective assistance of counsel because appointed counsel should have raised additional issues on appeal is subject to the standards set forth in *Strickland*, and Stevens, therefore, must show appellate counsel's performance was deficient and caused prejudice in the outcome of the appeal. *See Bell v. Cone*, 535 U.S. 685, 697-98 (2002); *Mintun v. State*, 144 Idaho 656, 661, 168 P.3d 40, 45 (Ct. App. 2007). An indigent defendant does not have a constitutional right to compel appointed appellate counsel to press all nonfrivolous arguments the defendant wishes to pursue. *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *Mintun*, 144 Idaho at 661, 168 P.3d at 45. Rather, the process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being the evidence of incompetence, is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Mintun*, 144 Idaho at 661, 168 P.3d at 45. Notwithstanding *Jones*, it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate counsel was incompetent. *Smith v. Robbins*, 528 U.S. 259, 288 (2000); *Mintun*, 144 Idaho at 661, 168 P.3d at 45. Only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome. *Smith*, 528 U.S. at 288; *Mintun*, 144 Idaho at 661, 168 P.3d at 45. The relevant inquiry on the prejudice prong in relation to appellate counsel is whether there is a reasonable possibility that, but for counsel's errors, the petitioner would have prevailed on appeal. *Smith*, 528 U.S. at 285.

In November 2000, after presiding over Stevens' second trial and sentencing proceedings, then District Court Judge Eismann was elected to the Idaho Supreme Court. When Stevens filed his motion for a new trial on June 13, 2001, Justice Eismann had resigned as a

14

district court judge and been sworn in as a Supreme Court justice. The matter was assigned to District Court Judge Darla Williamson, Justice Eismann's successor in office. However, the Idaho Supreme Court, noting that the Fourth Judicial District requested "judicial assistance," issued an order on July 16 assigning Justice Eismann to the case for purposes of adjudicating the motion for a new trial. Stevens' attorneys at the time filed with the Supreme Court a "Petition for Writ to Reconsider," objecting to the assignment of Justice Eismann, and also filed in the trial court a "Notice of Objection to Assignment of Judge" and a "Motion to Disqualify or in the Alternative Motion for Recusal," arguing Justice Eismann was not constitutionally eligible to sit as a district court judge. Specifically, Stevens cited to article V, section 11 of the Idaho Constitution, which requires that the State be divided into five judicial districts, "for each of which a judge shall be chosen by the qualified electors thereof . . . ." The only exception to the requirement of an elected or appointed judge, Stevens argued, appears in section 12, which states, "A judge of any district court, or any retired justice of the supreme Court or any retired district judge, may hold a district court in any county at the request of the judge of the district court thereof . . . ." Stevens contended Justice Eismann was not a district court judge, a retired district court judge, or a retired Supreme Court justice and therefore was not constitutionally permitted to hear the motion pursuant to article V.

On October 19, the Idaho Supreme Court, noting it considered Stevens' petition for reconsideration and applicable filings and indicating it was "fully advised," issued an order denying the petition "after due consideration." Subsequently, Justice Eismann also denied the disqualification filed in the district court request stating, "The motion is based upon the same argument that the Defendant presented to the Idaho Supreme Court in opposing the assignment. The Supreme Court rejected such an argument." Stevens did not challenge Justice Eismann's assignment on direct appeal.

After Stevens raised this issue in his post-conviction petition, the district court summarily dismissed the claim, noting the Supreme Court had assigned Justice Eismann to hear the new trial motion and had rejected Stevens' request that the Court rescind the assignment. The district court concluded: "The Supreme Court in its inherent power has the ultimate administrative authority in the judicial assignment." Stevens filed a "Motion for Reconsideration and/or to Alter or Amend," contending neither the State nor the district court, in summarily dismissing the claim, cited any authority for the proposition that the Supreme Court has inherent authority to

"assign a constitutionally ineligible person to sit as a judge of the district court." The district court denied the motion, stating, "The issue Stevens claims his appellate counsel should have raised on appeal, was already decided by the Supreme Court. Appellate counsel is therefore not ineffective [for] failing to raise on direct appeal that which was already decided. Furthermore, this court has no power to overrule a Supreme Court order."

On appeal, Stevens asserts there is "no doubt" that had the issue been raised by appellate counsel, the Supreme Court would have vacated the denial of the new trial motion due to the improper assignment of Justice Eismann. In addition, he contends the district court erred in concluding the Supreme Court had already decided the issue because his "Petition for Writ to Reconsider" was "no doubt denied [by the Supreme Court] for procedural rather than substantive reasons" because the Supreme Court did not have jurisdiction to decide the issue.

As we noted above, in order to show deficient performance, the applicant must show the attorney's conduct was not objectively reasonable. *Aragon*, 114 Idaho at 760, 760 P.2d at 1176. In the context of a claim that counsel was deficient for failing to assert a claim on appeal, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome. *Smith*, 528 U.S. at 288, *Mintun*, 144 Idaho at 661, 168 P.3d at 45. Here, we cannot say counsel's performance in failing to appeal this issue was objectively unreasonable such that it amounted to deficient performance. The Supreme Court itself appointed Justice Eismann to hear the new trial motion, and even after Stevens filed a motion in that court for reconsideration, which asserted the same claims of error he pursues in this appeal, the Supreme Court still rejected the motion. The fact that counsel did not then include this issue in the direct appeal to the Supreme Court is not unreasonable--it was counsel's prerogative as an appellate practitioner to pursue the issues most likely to prevail, and we cannot say counsel did not do so here. The district court did not err by summarily dismissing this claim.

16

2.    **Defense counsel**

a.    **Failure to discover and present evidence that the eyes were removed post-embalming**

Stevens contends defense counsel were ineffective for failing to discover and present evidence at trial that the child's eyes were removed after embalming,[8] a procedure that, he contends, caused damage to the eyes that the State's experts attributed to shaken baby syndrome. He points specifically to the failure of counsel to discover the mortuary embalming report, which suggested the eyes were removed post-embalming.

As indicated above, in order to prevail on a claim of ineffective assistance of counsel, a petitioner must show his counsel's performance was objectively deficient and that, but for the attorney's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Determining whether an attorney's pretrial preparation falls below a level of reasonable performance constitutes a question of law, but is essentially premised upon the circumstances surrounding the attorney's investigation. *Thomas v. State*, 145 Idaho 765, 769, 185 P.3d 921, 925 (Ct. App. 2008). We will not second-guess trial counsel in the particularities of trial preparation. *Id.* Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690; *State v. Mathews*, 133 Idaho 300, 306-07, 986 P.2d 323, 329-30 (1999). We must assess counsel's conduct by way of an objective review of reasonableness under prevailing professional norms so as to eliminate the distorting effects of hindsight. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003); *Murphy*, 143 Idaho at 147, 139 P.3d at 749. We must also make every effort to avoid a post hoc rationalization of the attorney's conduct. *Wiggins*, 539 U.S. at 526-27; *Murphy*, 143 Idaho at 147, 139 P.3d at 749.

The duty to investigate requires only that counsel conduct a reasonable investigation. *Mitchell v. State*, 132 Idaho 274, 280, 971 P.2d 727, 733 (1998); *Estes v. State*, 111 Idaho 430, 434, 725 P.2d 135, 139 (1986). In assessing the reasonableness of counsel's investigation, we consider not only the quantum of evidence known to counsel, but also whether the known

---

[8]    As indicated above, the district court found Stevens failed to prove by a preponderance of the evidence that the eyes were, in fact, removed post-embalming. Again, we need not address that factual finding given our disposition of this issue and, thus, proceed assuming the eyes were removed post-embalming.

17

evidence would lead a reasonable attorney to investigate further. *Wiggins*, 539 U.S. at 527; *Strickland*, 466 U.S. at 691; *Mathews*, 133 Idaho at 307, 986 P.2d at 330; *Murphy*, 143 Idaho at 146, 139 P.3d at 748. Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *Strickland*, 466 U.S. at 690-91.

The district court denied this claim upon finding defense counsel did not render objectively deficient performance in failing to discover the mortuary report because a reasonable attorney would not have sought out the embalming report:

> [T]here was no indication prior to Stevens' second trial that [the child's] eyes may have been removed post-embalming. Dr. Slaughter testified he retrieved [the child's] eyes and there was nothing to suggest he did not do so at autopsy. Stevens' counsel most likely relied on the truth of Dr. Slaughter's statements. An embalming report is not something a defense attorney would normally seek to discover. As it turned out, the embalming report in this case contained relevant information, but this was not known to counsel prior to the second trial. This Court must "reconstruct the circumstances at the time of trial from defense counsel's perspective." *Strickland*, 466 U.S. at 689. At the time of trial, counsel had no reason to investigate [the child's] embalming report. Without any reason to believe the embalming report might contain relevant evidence, counsel cannot be held to have rendered deficient performance for failing to discover it.
>
> The Court finds counsel's failure to discover the embalming report was reasonable under prevailing professional norms because a reasonable attorney would not have sought to discover this report.

Initially, we recognize that the Idaho Supreme Court, on direct appeal from the denial of Stevens' motion for a new trial, found there was substantial evidence in the record to support the trial court's conclusion that Stevens had failed to demonstrate the existence of newly discovered evidence. Stevens, and the dissent, argue that the conclusions reached by the Supreme Court, coupled with the trial court's finding that Stevens had not shown that the mortuary report could not have been discovered with the exercise of "due diligence" by counsel, precludes a finding on post-conviction that counsel were not deficient for failing to discover the report.[9] However, we

---

[9] We do not share the same reading or assessment of the relevance of the Supreme Court's decision regarding the new trial motion in *State v. Stevens,* 146 Idaho 139, 191 P.3d 217 (2008), as the dissent. Upon reading that decision, in conjunction with the trial court's decision on Stevens' motion for a new trial, we believe the dissent reads the Supreme Court decision too

are required to apply the *Strickland* standard, not the new trial standard, to this inquiry. As indicated above, the determination of whether an attorney's pretrial preparation fell below a level of reasonableness depends on the circumstances surrounding the attorney's investigation. *See Thomas*, 145 Idaho at 769, 185 P.3d at 925. Similar to the district court's description of the circumstances in this case, Justice Trout succinctly noted the following in her dissent from the Supreme Court's affirmance of the denial of Stevens' motion for a new trial:

> In the case at bar, there was absolutely no reason for defense counsel to search out an embalming report with one obscure reference to the color of [the child's] eyes, given Dr. Slaughter's specific, but wrong, testimony that he recalled removing the eyes during the autopsy, that he placed them in formalin and waited direction from the coroner on what to do with them. . . . Neither the State, nor its witness, Dr. Slaughter, gave any indication but that the eyes were removed during the

---

narrowly. Neither the trial court nor the Supreme Court confined itself to the existence and/or discovery of merely the embalming report in addressing the new trial motion. Instead, both also looked at the larger "issue" as argued by Stevens "that the embalming fluid and post-embalming removal caused some of the injuries to [the child's] eyes." *Id.* at 146, 191 P.3d at 222. The evidence presented in support of that claim consisted of "affidavits of three experts *who examined evidence presented at trial* and concluded that the macular folding and retinal hemorrhaging were caused after [the child's] death." *Id.* (emphasis added). Both the trial court and the Supreme Court concluded this expert testimony was based upon information existing prior to trial that could have been developed prior to trial; thus, it only amounted to a new interpretation of that preexisting evidence on an issue (the cause of the child's eye injuries) that Stevens knew would be of import at trial. *Id.* Specific to the embalming report, the Supreme Court noted that the report was available prior to trial and the mere fact that defense counsel did not inquire about the report prior to trial did not make the report newly discovered. *Id.* Therefore, although the embalming report may have been important to establish the predicate to the new trial motion--that the eyes were removed post-embalming--the evidence regarding the condition and damage to the child's eyes, upon which the experts relied in support of the motion for a new trial, was in existence prior to trial. We also note that although the district court addressed the issue, the Supreme Court did not even reach the due diligence factor of the new trial analysis. *Id.*

Additionally, the standards for the decision on the motion for a new trial and the present issue of ineffective assistance of counsel are distinct. In the new trial motion, the issue was the existence of newly discovered evidence, but in this case, the focus is on the *conduct* of counsel. Whatever the Supreme Court's view of whether proffered evidence satisfied the standards for being newly discovered, our task is to determine whether counsel's performance was deficient and whether any such deficiency resulted in prejudice to an extent warranting reversal. Thus, we do not believe that the *Stevens* decision--addressing an entirely separate issue--dictates the result here.

autopsy and held until they could be sent to an expert ophthalmologist. Frankly, even to a lay person, it seems extraordinary that body parts would be examined after they had been embalmed and that no one would think to comment on that.

*Stevens*, 146 Idaho at 154, 191 P.3d at 232 (Trout, J., dissenting).

Importantly, there is no assertion that defense counsel here failed to uncover and utilize the most obvious and highly relevant information (including police reports, medical records, and the autopsy report) or to pursue the obvious defenses given the evidence uncovered. Nor was there evidence that a mere lack of objectively reasonable diligence was the cause of the failure to uncover the mortuary report. In addition, as we discussed above, the potentially exculpatory significance of the eyes being removed post-embalming was not readily apparent and only came to light once the defense found an expert to opine such a procedure could damage the eyes in a manner replicating that seen in shaken baby cases. Even now, after Stevens was given the opportunity to develop the evidence at a post-conviction evidentiary hearing, the evidence is not entirely clear as to when the eyes were removed--and expert opinions continue to be conflicting as to whether the eyes were damaged by embalming. Thus, even assuming reasonably diligent counsel would have discovered the mortuary report, discovery of the report does not warrant an assumption that reasonable counsel would have recognized its importance. *See Strickland*, 446 U.S. at 690 (noting that counsel's conduct must be evaluated from "counsel's *perspective at the time*") (emphasis added)). Holding that defense counsel were required, in order to render constitutionally adequate assistance, to uncover an ambiguous reference in an obscure report, recognize that the piece of evidence may be significant, and locate experts to testify as much, is simply untenable given the strong presumption existing that counsel's performance is adequate. *See Id.*; *Vick v. State*, 131 Idaho 121, 124, 952 P.2d 1257, 1260 (Ct. App. 1998). "The constitutional requirement for effective assistance of counsel is not the key to the prison for a defendant who can dredge up a long series of examples of how the case might have been tried better." *Thomas*, 145 Idaho at 770, 185 P.3d at 926 (citing *Ivey v. State*, 123 Idaho 77, 80, 844 P.2d 706, 709 (1992)).

This case is similar to *Mathews*, 133 Idaho 300, 986 P.2d 323, where the defendant contended his defense counsel rendered deficient performance by failing to discover a search warrant that was not signed until the day after the search was conducted and, therefore, failing to file a motion to suppress on this basis. On appeal, the Idaho Supreme Court held that although defense counsel's investigation in this case did not reveal the fact the warrant was not signed

until the day after the search, defense counsel did conduct substantial investigation regarding suppression issues relating to the issuance and execution of the warrant such that his failure to uncover this fact was not the result of an objectively deficient investigation. *Id.* at 307-08, 986 P.2d at 330-31. Like in this case, the date discrepancy *could* have been discovered by counsel prior to trial, but the mere fact counsel did not discover it did not amount to deficient performance where counsel's investigation was otherwise reasonable. The district court did not err in denying Stevens' claim that defense counsel were ineffective for failing to discover the mortuary report.

### b. Failure to discover and present drug evidence

Stevens contends the district court erred by denying his claim that defense counsel were ineffective for failing to discover and present evidence regarding the effects of several medications the child was taking at the time of his death. Stevens contends a reasonable jury could have concluded the child's death was caused by a medication-induced heart attack and, therefore, it was unreasonable for counsel to have not presented evidence at trial concerning the effects of this medication.

The primary medication at issue was Propulsid, which the child had been taking for nine months to treat acid reflux. Stevens points out that, at the time of the second trial, there were warnings that Propulsid should not be prescribed to infants; that it could cause serious, life-threatening ventricular arrhythmias; and that it was contraindicated with antibiotics, such as Zithromax, which the child was also taking. However, this information was not presented to the jury by defense counsel. Information regarding the risks of Propulsid was contained in the 1998 Physician's Desk Reference, a copy of which counsel believed was available in his office, which would have led counsel to discover further warnings in a 1998 "Dear Doctor" letter sent by the drug maker to practitioners and various medical publications.

In addressing this claim following the evidentiary hearing, the district court initially examined Stevens' assertions regarding how the Propulsid theory of death could have aided his defense. First, Stevens argued it would have made his story more believable (that the child sustained his head injuries in a fall down the stairs) because the jury would have a possible explanation as to why the child fell down the stairs. Second, he contended the evidence would have given the jury an alternative explanation for the child's death and allowed the jury to find the child did not die as a result of his head injury as the State insisted, but as a result of

21

arrhythmia. The district court easily dismissed the former argument, finding there was no reason for counsel to further investigate and prove why an eleven-month-old child fell down the stairs, as it had already presented a credible explanation for that proposition in the form of testimony that the child was often unsteady on his feet because he was learning to walk and had fallen down the stairs on a previous occasion. This explanation, the court observed, was significantly more believable than a version of events where the child fell as the result of suffering a Propulsid-induced heart attack at the exact moment he was on the stairs.

The district court found the viability of the second contention, that the evidence would have provided an alternate theory of the cause of the child's death, to be a more difficult question. As Stevens pointed out, he needed only to raise a reasonable doubt as to whether he caused the child's death and, in this regard, presenting evidence tending to show the child died due to Propulsid would have been consistent with his defense strategy. In assessing this claim, the district court described the pretrial investigation undertaken by defense counsel in regard to Propulsid:

> Counsel sent letters to Dr. Dimaio and Dr. Plunkett asking them about possible drug interaction between Zithromax and Propulsid. Counsel also talked to attorney Annabelle Hall about the possible dangers of Propulsid. It appears from the record that neither Dr. Dimaio nor Dr. Plunkett ever informed counsel Propulsid should be investigated further. While counsel did get some indication from Ms. Hall that Propulsid could have played a role in [the child's] death, [Lead Counsel] testified, "we never got an indication that that would be a fruitful area to explore." Based on these facts, counsel appears to have made the conscious choice to not present evidence concerning Propulsid at trial. When asked whether any decisions were made concerning whether to present the Propulsid theory at trial [Second Chair] stated, "we probably made decisions to commit to a certain strategy as opposed to having kind of a shotgun approach." [Second Chair] went on to explain why a shotgun approach to this case would not have been a good idea and state[d] that, "I don't think strategically that I would have argued that [the child] died of a heart attack to the jury." [Second Chair] also testified, "obviously, a conscious decision was made that I couldn't link it up or it would be in the soup."

(Citations omitted.)

Based on these facts, the district court concluded defense counsel's decision not to include Propulsid evidence in their trial strategy was not deficient performance as it was not based on inadequate preparation or investigation. The court found the actions described above amounted to an adequate investigation into the issue:

22

[C]ounsel's decision to omit evidence regarding Propulsid from their trial strategy was not based upon inadequate preparation or other shortcomings. Counsel's decision was the result of not receiving any positive information from their medical experts, which appears to have been the result of a lack of scientific understanding about the dangers of Propulsid in 1998. Because counsel made a reasonable strategic decision not to pursue the Propulsid theory of death, counsel's performance was not deficient.

On appeal, Stevens argues the district court erred by determining defense counsel conducted a reasonable investigation into the Propulsid issue, asserting counsel failed to make "even the most rudimentary investigation" and, therefore, it "was not a conscious decision to not pursue the Propulsid theory of death." Specifically, Stevens contends counsel's investigation was deficient because even after counsel were alerted by Hall as to the possible dangers of the drug, counsel failed to look up Propulsid in the 1998 Physician's Desk Reference or to look at a box of Propulsid that also contained a warning, which would have led them to additional warnings such as the 1998 "Dear Doctor" letter, scholarly articles, and expert testimony. It was unreasonable, Stevens contends, for counsel to fail to consult with the "standard reference book on prescription drugs," especially after Hall alerted defense counsel to the issue.

Like the district court, we believe this presents a close issue. However, we agree with the district court that defense counsel's performance in failing to discover the warnings available in 1998, that Propulsid could cause heart attacks in children, was not the result of an objectively unreasonable abbreviation of investigation into the issue. As the district court pointed out, counsel undertook efforts (that were not insignificant) to establish such a link. The record establishes that once Hall, the out-of-state attorney that defense counsel consulted with for help in this case, alerted counsel to the possible dangers of Propulsid and drug interactions, counsel brought this issue to the attention of, at the very least, both Dr. Vincent Dimaio[10] and Dr. John

---

[10] The letter to Dr. Dimaio expressed defense counsel's interest in retaining Dr. Dimaio as an expert witness and identified possible areas of testimony including "drug interactions (Zithromax and Propulcid)" [sic]. Second Chair's notes from a later conversation with Dr. Dimaio indicated they discussed the Zithromax/Propulsid drug interaction issue, a fact Second Chair confirmed in his testimony at the evidentiary hearing.

Plunkett. Dr. Plunkett, a forensic pathologist, eventually testified as an expert witness at trial.[11] In fact, Second Chair, who conducted the bulk of the investigation into the issue, testified at the evidentiary hearing that he "probably asked any medical expert that would talk to me whether or not the medications could have somehow played a role [in the child's death]." As a result of these discussions, Second Chair continued, he learned "generically . . . it was troubling that a child would be taking these medications, especially together. But I don't ever remember making a link that would connect the dots for Ed's defense." Lead Counsel testified that he personally spoke to Dr. Plunkett, one of the defense's main expert witnesses who testified at trial, regarding the Propulsid issue and they "went through pretty exhaustively . . . all the medical things regarding [the child] that were provided to him." As the district court found, because counsel were unable to link the drug issue to the child's death, even after consulting these experts,[12] counsel made the decision to abandon further investigation.

Counsel's actions in this instance did not amount to constitutionally deficient performance. As we discussed above, just because counsel *could* have found something helpful, doesn't mean he is deficient for not having found that information. In this case, we are not willing to say it is constitutionally unreasonable for counsel to ask numerous doctors (experts in issues concerning the death of the child) about the possible side effects of a drug and, not having received any positive indication that a further investigation into the drug is necessary, to fail to then consult a reference book. This is the type of "rigid requirement[] for acceptable assistance" the *Strickland* Court warned against. *Strickland*, 466 U.S. at 690. Here, defense counsel made a concerted effort to investigate the issue, and just because it did not pan out, or may not have been conducted in the precise manner which, in hindsight, seems appropriate since there were, in fact, warnings regarding Propulsid at the time, we cannot say it constituted such deficient performance that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686;

---

[11] The letter sent to Dr. Plunkett, who was eventually retained as an expert who testified at trial, listed some areas of "concern" including "[t]he effect of simultaneous ingestion of prescription medications; Zithromax and Porpulcid [sic], and possible drug interactions[.]"

[12] One of Stevens' own experts who submitted an affidavit in support of Steven's post-conviction petition stated, "Medical knowledge about the danger of Propulsid was limited in 1999."

*Shackelford*, 150 Idaho at 383, 247 P.3d at 610.[13]  Thus, the district court did not err in denying this claim.

### c. Failure to consult a radiologist regarding the skull fracture

Stevens also contends defense counsel were ineffective for failing to consult a radiologist in regard to the child's skull fracture prior to trial.  Had counsel done so, Stevens asserts, it could have presented evidence that the child's skull fracture, upon the child's arrival in the emergency room, was only three to four centimeters long and lengthened to eight to nine centimeters (as testified to by the State's experts) only later as the result of intercranial pressure.  Such evidence, he asserts, would have made it more likely the jury would conclude an accidental fall could have caused the injury.  In addition, Stevens argues that showing a radiologist all of the child's relevant head scans would have revealed evidence that the child's head injury occurred prior to the time Stevens was alone with the child.

### i. Length of the fracture

In regard to the length of the facture, the district court set forth the following facts relevant to the assessment of the child's skull fracture following Stevens' 911 call:

> When paramedics first arrived at Mr. Stevens' house there was no indication [the child] had a skull fracture.  [The child] was not bleeding and paramedics did not notice any significant signs of injury to the back of [the child's] skull.  It was not until a CT scan was taken of [the child's] skull that doctors realized he had a fracture.  [The child] was first given a CT scan at St. Alphonsus at 4:35 p.m. on December 27.  At 6 p.m. he was transported to St. Luke's where doctors took x-rays and more CT scans of [the child's] skull.  At autopsy on December 29, Dr. Slaughter measured [the child's] skull fracture as being nine centimeters from end to end.  Dr. Slaughter testified at trial that [the child's] skull fracture was eight to nine centimeters long.  At trial, the State's expert Dr. Smith used x-rays of [the child] taken at St. Luke's to show the jury the fracture, but he never gave an opinion as to the length of the fracture.  It appears no one attempted to measure the size of [the child's] skull fracture based upon the CT scan taken at St. Alphonsus, even though this scan was taken within hours of

---

[13]     We also note this case is distinguishable from those cases where we have found deficient performance where counsel failed to review important documents pertaining to the case.  *See Milburn v. State*, 130 Idaho 649, 946 P.2d 71 (Ct. App. 1997).  At the evidentiary hearing, Second Chair testified he "read every piece of paper that came into my office as the discovery in Ed Stevens' case, and that included medical records, it included diagnostic summaries of [the child], it included autopsy reports, it included police reports.  It included every medical record that came in a banker's box or three-ring binder as part of discovery."

[the child's] injury. Dr. Smith never offered an opinion as to the length of the fracture, and appears to have taken Dr. Slaughter at his word that a high force impact caused [the child] to suffer a nine centimeter fracture.

(Citations omitted.)

In arguing defense counsel were ineffective in regard to this issue, Stevens submitted several affidavits, the primary one from Dr. Patrick Barnes, a radiologist, averring that examination of the CT scan from St. Alphonsus indicated the fracture was only three to four centimeters in length at that time. In offering this opinion, Dr. Barnes did not dispute that the fracture appeared to be eight to nine centimeters in the x-rays and CT scan taken later at St. Luke's, but explained his opinion that intracranial pressure caused the fracture to increase in size between the St. Alphonsus and St. Luke's scans. Dr. Wecht indicated in his affidavit that he agreed with the opinions set forth in Dr. Barnes' affidavits and opined that the smaller length of the fracture "strengthens and buttresses my opinion that this fracture could quite easily have been caused by an accidental fall" and that "[t]here is no scientific basis for an absolute, rigid conclusion that such a skull fracture could only have been sustained through the deliberate infliction of force by a third party."

The district court first noted Lead Counsel admitted at the evidentiary hearing he "probably" did not consult with a radiologist regarding the child's various CT scans and x-rays because he "didn't appreciate the significance of it at the time." Stevens argued this failure amounted to deficient performance because a reasonably competent attorney would have consulted with a radiologist under the circumstances and, therefore, would have discovered the child's initial fracture size was only three to four centimeters. In addressing this issue, the district court noted defense counsel has an obligation to conduct a prompt and thorough pretrial investigation and there are certainly circumstances where the only reasonable defense strategy requires consultations with experts in a particular field and counsel renders deficient performance if he fails to consult with such an expert. However, the court also noted that *Strickland* allows counsel to "make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The court then found the following facts in assessing whether counsel's failure to specifically consult a radiologist was deficient performance:

The affidavit of Dr. Barnes shows [that] whatever caused [the child's] skull fracture required less force than previously thought by either party because the impact only caused a four-centimeter fracture rather than a nine-centimeter fracture. However, Stevens' counsel did retain experts who testified that a fall

26

down the stairs could produce a great deal of force. Dr. Richard Reimann, a physicist, testified [the child's] head could have been traveling at eight to twelve miles per hour at the time of impact. He also testified [the child's] head would have been subject to forces of at least 160 g's, which is the threshold for serious injury. Dr. Lawrence Thibault testified [the child's] fracture could have easily been caused by a fall down stairs. Counsel also called Dr. John Plunkett who testified that a fall from even two stairs up can produce enough force to crack a child's occipital bone. Thus, counsel secured three experts, a physicist, a bio-engineer and forensic pathologist, who all testified that a fall from these stairs could have caused a nine centimeter fracture in [the child's] occipital bone. Counsel found exactly what they set out to find, three experts who were all ready to testify that Stevens' version of events was not only plausible, but very possible. A reasonable attorney would not continue to investigate a question for which he already had an answer. At this point, a reasonable attorney would have ceased investigation into whether a fall down stairs could have caused [the child's] fracture and proceeded to more fruitful areas of investigation.

Perhaps if one of Stevens' three experts had given counsel some indication that this fracture was too large to have been caused by a fall down stairs it would have been incumbent upon counsel to have a radiologist double check to make sure that the impact actually caused a nine-centimeter fracture, but that is not this case. Doctors Thibault, Reimann and Plunkett all informed counsel that [the child's] fracture, which they assumed was nine centimeters, could have been caused by a fall down the stairs. This testimony proved Stevens' version of events was just as likely as the State's. Because counsel investigated the matter and discovered that a nine-centimeter fracture can be caused by a fall down stairs, there was no reason for counsel to use their limited time consulting with a radiologist.

(Citations omitted.) On this basis, the district court concluded that "counsel's performance fell within the wide range of reasonable professional norms and met objective standards of reasonableness."

On appeal, Stevens contends the district court erred in coming to this conclusion in several regards. Pertaining to the court's conclusion that a reasonable attorney would not have continued the investigation under the circumstances, Stevens claims it is was not reasonable for his defense counsel to "simply accept the state's assertion that the skull fracture was 8 cm and simply forego any investigation," especially where counsel were aware prior to trial that the size of the skull fracture was an important piece of evidence for the State and the State's experts would testify that it was far too large to have been caused by a fall down the stairs. In addition, the defense was aware it needed to "neutralize the emotional impact such a large skull fracture would have on a jury."

Much like the issue of whether counsel were deficient for failing to discover evidence that warnings existed for Propulsid, discussed above, the fact that counsel *could* have discovered helpful evidence that may have been persuasive at trial is not the standard. Rather, we must examine the steps counsel did take in investigating the issue, which, as described by the district court above, were not insignificant. Second Chair testified he had reviewed every medical record in the case, and there is no indication in the record, nor argument from Stevens, that counsel did not provide the experts it consulted with the requisite medical records. As noted by the district court, the information that counsel did receive regarding the length of the fracture from the three experts did not indicate that further investigation was required in order to support the defense's theory because all three indicated even an eight to nine centimeter fracture could be caused by an accidental fall. In addition, none of the experts apparently alerted counsel to the possibility that the fracture could have been smaller at its inception.

This case is analogous, to some degree, to *State v. Porter*, 130 Idaho 772, 948 P.2d 127 (1997). In that case, Porter's former girlfriend was found dead and Porter insisted another man was the perpetrator. The pathologist who performed the autopsy of the victim, indicated, among other findings, that there were several areas on the victim's scalp where hair appeared to have been pulled out in large clumps. The State presented testimony from several of Porter's former girlfriends who testified that Porter had physically abused them, including pulling out their hair. After he was convicted of murdering the victim, Porter argued in his post-conviction petition that his defense counsel was ineffective for failing to call expert witnesses at trial. Specifically, at the post-conviction proceeding, he presented the testimony of several experts, including a clinical psychologist, who testified that hair pulling was common among men who physically abused women; a clinical neuropsychologist who testified that Porter is intellectually deficient;[14] and a forensic pathologist who testified regarding the commonality of hair loss in victims of violent crimes, the errors made during the autopsy of the victim's body, and other findings in regard to the cause of death.

In assessing Porter's claim of ineffective assistance of his defense counsel on appeal, our Supreme Court stated that although it was "somewhat troubled" by the fact Porter's counsel

---

[14] This was relevant because the State had argued at trial that the alternate alleged perpetrator was too intellectually deficient to have committed the crime.

28

made no attempt at all to employ a pathologist to review the autopsy and give an independent opinion and that it had "some question" about counsel's failure to request any kind of psychologist to determine Porter's mental capabilities, it did not believe the conduct was so deficient as to fall below an objective standard of reasonableness. *Id.* at 793-94, 948 P.2d at 148-49. The Court noted that although it was "not prepared to conclude that Porter's counsel at trial was stellar," it believed Porter "failed to overcome the presumption announced in *Aragon* that trial counsel's performance was competent and that trial tactics were based on sound legal strategy." *Porter*, 130 Idaho at 794, 948 P.2d at 149 (citing *Aragon*, 114 Idaho at 761, 760 P.2d at 1177). Consequently, the Court concluded that, overall, the performance of Porter's trial counsel did not fall below an objective standard of reasonableness. *Id.*

Thus, in *Porter*, the Supreme Court made clear that counsel's performance will not be found to have been deficient just because counsel failed to consult experts who may have been helpful in the case. In this case, as the State points out, defense counsel consulted three experts on this issue, while in *Porter*, the Court found it was not deficient performance for counsel to fail to present any expert testimony on these relevant issues. The constitutional guarantee of effective assistance of counsel simply does not ensure that counsel render "stellar" performance; rather, to be deficient performance, "counsel's conduct [must have] so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. That is not the case here. *See also Estes*, 111 Idaho at 436, 725 P.2d at 141 ("[T]aking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial." (quoting *United States v. Hasting*, 461 U.S. 499, 508-09 (1983)). The district court did not err in denying Stevens' petition for post-conviction relief on this issue.

### ii. Timing of the fracture

In support of his claim that defense counsel were ineffective for failing to consult a radiologist and thus failing to present evidence regarding the timing of the fracture, Stevens presented the affidavit of Dr. Barnes:

> Based upon my medical training and experience as a medical Doctor, it is my medical opinion that the aforementioned CT scans [taken on December 27 and 28, 1996] show high force impact trauma to the brain, which is nonspecific in regards to proving accidental versus inflicted trauma. The suture separation noted on [the] December 27, 1996, CT scan, could not occur in a two (2) to three (3) hour period and would take approximately six (6) to [twelve] (12) hours to occur.

29

> The occipital skull fracture could be twenty-four (24) to forty-eight (48) hours old or older. The high-density hemorrhage in the brain could be three (3) hours to seven (7) days old and that the upper scalp swelling could range from three (3) hours to twenty-four (24) hours depending on the nature of the injury.

This evidence, Stevens contends, shows the child's head injuries were caused prior to the time period he was alone with the child.[15]

The district court denied the claim, finding Stevens had not shown prejudice because even if the evidence contained in Dr. Barnes' affidavit had been presented at trial, there was not a reasonable probability the jury would have reached a different result:

> The main problem with Dr. Barnes' timeline is that Stevens has no other evidence to complement it. More specifically, he has no evidence anything happened to [the child] during these new time frames which a jury could latch onto as having caused [the child's] injuries.
>
> Dr. Barnes' opinion about [the child's] suture separation would mean [the child's] suture separation started between 4:35 a.m. and 10:35 a.m. on December 27. Between 4:35 and 10:35 a.m. [the child] was sleeping with Stevens and [the child's mother]. According to testimony from Stevens and [the child's mother], it appears that [the child] was in bed with Stevens this whole time. Stevens has never argued [the child] fell or otherwise suffered a blow to the head during this time frame. Additionally, he has never argued [the child's mother] injured [the child] during this time. Without testimony something happened to [the child] within this time frame this evidence would have done nothing more than allow the jury to speculate that maybe something happened to [the child] that neither [the child's mother] nor Stevens knew about. Dr. Barnes' opinion about the skull fracture and hemorrhage fare no better. There is no evidence [the child] suffered a blow to the back of his head in the seven days prior to December 27. Stevens' counsel has pointed out [the child] fell out of a shopping cart, and therefore the jury could have believed this caused [the child's] injury. The problem with this is the shopping cart fall occurred on December 17. This is still outside of Dr. Barnes' expanded timeline, and therefore irrelevant to this argument.

The "speculative possibility" the child may have been otherwise injured in the days prior, the court concluded, was not sufficient to show a reasonable probability of a different outcome at trial.

---

[15] Stevens states he fell asleep around 2:40 p.m. while watching the child on December 27 and awoke around 3:00 p.m. to "thumps or a thud" to find the child, not moving, at the bottom of the stairs. His call to 911 was received by dispatch at 3:05 p.m., and paramedics arrived at the house at 3:13 p.m.

We agree with the district court's analysis and conclusion. Speculative evidence that the child's head injury *may* have been caused at some earlier point, when Stevens' statement was that he awoke to thumps and found the child at the bottom of the stairs and there was no evidence of a previous fall within the relevant timeframe, does not meet the prejudice standard set forth in *Strickland*.

### d. Cumulative error

Finally, Stevens contends the cumulative effect of the allegation of deficient performance by defense counsel warrants relief on his ineffective assistance claim. Although this Court has recognized the doctrine of cumulative error, a necessary predicate to application of the doctrine is a finding of error in the first instance. *Boman v. State*, 129 Idaho 520, 527, 927 P.2d 910, 917 (Ct. App. 1996). Having determined the district court correctly held the alleged errors of Stevens' defense counsel did not constitute defective performance, Stevens has failed to make a sufficient showing of prejudice regarding any cumulative effect of his counsel's conduct. Therefore, the doctrine of cumulative error has no applicability in this case.

### III.

### CONCLUSION

The district court did not err in denying Stevens' *Brady* claim because the possible exculpatory nature of the evidence was not apparent to the prosecutors or investigators in the case. Nor did the district court err in summarily dismissing Stevens' claim of ineffective assistance of appellate counsel or in denying, following an evidentiary hearing, Stevens' claims of ineffective assistance of defense counsel, because Stevens has not shown deficient performance. The district court's judgment denying Stevens' petition for post-conviction relief is affirmed.

Judge GRATTON **CONCURS.**

Judge LANSING, **CONCURRING IN PART AND DISSENTING IN PART**

I fully concur in all parts of the foregoing opinion except Section II(B)(2)(a) concerning the failure of Stevens' defense attorneys to discover and present evidence that the child's eyes were removed after the body was embalmed. If I were able to address this issue on a clean slate, I would also concur in the majority's opinion affirming the district judge's finding that defense counsel did not render deficient performance because a competent attorney reasonably would not have sought out the embalming report. We are not, however, writing on a clean slate. Our

31

disposition of this issue in the present post-conviction action must take into account the Idaho Supreme Court majority's prior decision on a very closely-related issue--whether Stevens was entitled to a new trial based upon newly discovered evidence where the new evidence was the same information about post-embalming removal of the child's eyes.

In *State v. Stevens*, 146 Idaho 139, 146, 191 P.3d 217, 224 (2008), as here, it was undisputed that defense counsel were unaware of this evidence until after Stevens' trial. A majority of the Idaho Supreme Court nevertheless held that Stevens was not entitled to a new trial based upon this evidence because the evidence was not newly discovered. In that opinion, the Supreme Court majority stated that it was applying the four-part test articulated in *State v. Drapeau*, 97 Idaho 685, 691, 551 P.2d 972, 978 (1976), which requires a defendant seeking a new trial based on newly discovered evidence to demonstrate that: (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the evidence is material, not merely cumulative or impeaching; (3) it will probably produce an acquittal; and (4) failure to learn of the evidence was not due to a lack of diligence on the part of the defendant. *Stevens*, 146 Idaho at 144, 191 P.3d at 222. Without addressing the fourth prong of the *Drapeau* test--the due diligence factor--the majority held that the embalming report was not newly discovered because it was available prior to trial. It does not appear that, by this holding, the *Stevens* majority intended to establish a new rule that no evidence in existence prior to trial could be "newly discovered" evidence justifying a new trial, for to so hold would require overruling the four-part *Drapeau* test that the majority opinion expressly stated that it was applying. The *Drapeau* test plainly allows evidence that existed prior to trial to qualify as newly discovered evidence that could justify a new trial; otherwise, the fourth prong of the *Drapeau* test would be superfluous. Another decision cited by the *Stevens* majority, *State v. Weise*, 75 Idaho 404, 410, 273 P.2d 97, 100 (1954), does not hold that evidence cannot qualify as newly discovered if it existed pretrial and therefore was available. Rather, the *Weise* decision states that where the evidence "was *known* and available prior to and during the course of a trial, it is not in any sense newly discovered." *Id.* (emphasis added). Thus, in order to interpret the majority decision in *Stevens* in a manner consistent with the authorities upon which it relies, I conclude that its holding that the embalming report was not newly discovered because it was not "unavailable" means that the report was so readily available that knowledge of it was imputed to the defense team. This interpretation is consistent with the opinion's statement that "at most, Stevens has

demonstrated that he did not recognize the importance or materiality of the Mortuary Embalming Report." *Stevens*, 146 Idaho at 146, 191 P.3d at 224.

Ultimately it does not matter whether this is a correct interpretation of the Supreme Court majority's opinion in *Stevens*, for regardless of the rationale by which the majority arrived at its decision, the holding is clear: the embalming report was not "newly discovered" after the trial. If it was not newly discovered after the trial, then it must have been "discovered" before or during the trial. If, as the Supreme Court majority held, the evidence was sufficiently "available" to be deemed "discovered" at or before trial, then it is inconsistent for Idaho courts to reject Stevens' claim of ineffective assistance of counsel by holding, contrariwise, that this same evidence was so obscure and unavailable that a reasonable and competent attorney would not have discovered it.

Constitutional standards of due process require, at a minimum, fundamental fairness in judicial proceedings. *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985); *State v. Lewis*, 144 Idaho 64, 66, 156 P.3d 565, 567 (2007); *State v. Green*, 149 Idaho 706, 709, 239 P.3d 811, 814 (Ct. App. 2010). For Idaho courts to hold, on the one hand, that Stevens was not entitled to a new trial because the embalming report was not newly discovered and, on the other hand, that he is not entitled to relief for ineffective assistance of counsel because a reasonably competent attorney would not have discovered the same evidence before trial, is an unjust and unjustifiable inconsistency. It is a flagrant "Catch 22" by which the petitioner is denied relief through Idaho courts' resolutions of the same issue in opposite ways in successive proceedings.

As stated at the outset of this dissent, were it not for my obligation to adhere to the majority decision in *Stevens*, I would embrace the majority opinion here that Stevens' defense attorneys acted reasonably and competently when they failed to discover and utilize the information in the embalming report. That was also the view of the dissenting justice in *Stevens*. However, the dissent's view did not prevail in *Stevens*, and therefore, in my view, it must be accepted in this case that the embalming report was so readily available to defense counsel that it was "discovered" before trial. It follows that counsel must be deemed deficient for failing to examine the report and appreciate its evidentiary significance.

The remaining question in this post-conviction case is whether Stevens has sufficiently shown prejudice from this deficient performance to entitle him to relief for ineffective assistance of counsel. A showing of prejudice does not require that he demonstrate that the missed

evidence, and its implications for the State's contention that eye injuries indicated the child was shaken, would have more likely than not resulted in an acquittal. Rather, he need only show a reasonable probability that, absent counsel's deficiency, "the factfinder would have had a reasonable doubt respecting guilt." *Strickland v. Washington*, 466 U.S. 668, 695 (1984). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* at 694. I believe that standard is satisfied here. As concisely stated by the dissenting opinion in *Stevens*, "evidence that embalming the eyes may have caused the hemorrhaging is critical evidence and could very well have caused the jury to question the State's theory and produced an acquittal." *Stevens*, 146 Idaho at 155, 191 P.3d at 233 (Trout, J. dissenting). This conclusion is bolstered by the fact that Stevens' first trial on the murder charge ended with a hung jury.

For these reasons, I would hold that Stevens has demonstrated ineffective assistance of counsel due to his attorney's failure to examine and utilize information in the embalming report, and that Stevens is therefore entitled to a new trial.